UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20577-CR-KMM

UNITED STATES OF AMERICA

vs.

DAVIE JULIAN RODRIGUEZ,

    Defendant.
_____/

### UNITED STATES' MEMORANDUM OF LAW FOLLOWING HEARING ON DEFENDANT'S MOTION TO SUPPRESS

On October 15, 2014, this Court held a hearing on Defendant's motion to suppress. Following that hearing, this Court ordered the parties to submit supplemental briefing on the following points of law: (1) first, under the facts presented, when Detective Lluis reached into the car merely to turn off the ignition, did he effect a "search" of the car within the meaning of the Fourth Amendment; and (2) second, if so, did that "search" violate the Fourth Amendment.

As explained below, Detective Lluis's simple act of reaching halfway into the car to turn off the ignition, through a door left open by the defendant (when the defendant on his own exited the car), did not constitute a "search" under the Fourth Amendment. This is because the purpose of turning off the ignition had nothing to do with acquiring information or discovering evidence; it served merely the community safety-related function of not leaving a car running that was stopped illegally in a public drive-through of a bank during business hours while the officers waited for the tow truck to arrive. Even assuming, however, that Detective's action constitutes a search, it surely does not constitute a Fourth Amendment violation, because the officer's actions fall within the community-caretaker exception to the warrant requirement, and more generally, are eminently reasonable under the circumstances. *See, e.g.*, *Brigham City, Utah v. Stuart*, 547

1

U.S. 398, 403 (2006) ("The ultimate touchstone of the Fourth Amendment is reasonableness.");

*Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) ("The ultimate standard set forth in the Fourth Amendment is reasonableness.").

I.  **DETECTIVE LLUIS'S MERE ACT OF REACHING INTO THE CAR TO TURN OFF THE IGNITION, ON THESE FACTS, DOES NOT CONSTITUTE A "SEARCH" WITHIN THE MEANING OF THE FOURTH AMENDMENT.**

   **A. Relevant Legal Principles**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In general, a "search" within the meaning of the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Ordinarily, a driver or owner of a vehicle has a reasonable expectation of privacy in the inside compartment of his car.[1] Because of that expectation of privacy, the Court has deemed a search of a car (or other private property) without a valid search warrant presumptively unreasonable unless one of the reasonable exceptions to the warrant requirement applies.

Under the Supreme Court's jurisprudence, the threshold question of whether a "search" has occurred is multifaceted; it "depends on the nature of the intrusion, the vantage point of the officers' observation, and the efforts made by the owner of the property to maintain privacy."

---

[1] As the Court has explained, however, that expectation is diminished in the context of a car, because "its function is transportation," it "seldom serves as one's residence or as the repository of personal effects," it "has little capacity for escaping public scrutiny," it "travels public thoroughfares where both its occupants and its contents are in plain view," and it's the "subject of pervasive regulation by the State." *New York v. Class*, 475 U.S. 106, 112-13 (1986) (internal quotation marks omitted).

2

Donald F. Samuel, *Eleventh Circuit Criminal Handbook*, §116 p. 6-3 (2013). As noted, the Court has looked to whether the litigant has an expectation of privacy in the area searched. *Id.* But the Court, particularly recently, has made clear that one's expectation of privacy is not the sole and determinative factor in assessing the question of whether a "search" took place. Instead, as demonstrated below, the Court has hinged its analysis largely on the *purpose* behind the state-initiated action. In other words, if the goal of the state action is to acquire information or to discover evidence, then the Court has found implicit in that action a "search" within the Fourth Amendment.

This focus on the purpose of state action was on clear display in *United States v. Jones*, 132 S. Ct. 945 (2012), the so-called "GPS tracking" case. In *Jones*, the Court held that placing a GPS tracking device on a car for 28 days for the purpose of monitoring the car's movements amounted to a "search"—not because the driver did or did not have an expectation of privacy in the car—but because the act of placing the device on the car constituted a trespass for the purpose of acquiring information. *Id.* at 951 (citing *United States v. Knotts*, 460 U.S. 276 (1983) ("[W]hen the Government does engage in physical intrusion of a constitutionally protected area *in order to obtain information*, that intrusion may constitute a violation of the Fourth Amendment." (emphasis added)) (Brennan, J., concurring in judgment); *see also id.* at 949 ("It is important to be clear about what occurred in this case: The Government physically occupied private property *for the purpose of obtaining information*." (emphasis added)).

Similarly, in the recent case of *Florida v. Jardines*, 133 S. Ct. 1409 (2013), the Court held that an officer's act of walking up to the front door of a house with a drug-detection dog so that the dog could sniff the front door constituted a "search" under the Fourth Amendment, because the police entered the property "*in hopes of discovering incriminating evidence*." *Id.* at

3

1416 (emphasis added). The Court stated further: "That the officers learned what they learned only by physically intruding on Jardines' property *to gather evidence* is enough to establish that a search occurred." *Id.* at 1417 (emphasis added)). *See also id.* (noting that the question of whether the officers' conduct constitutes a search depends upon whether "their behavior objectively reveals *a purpose to conduct a search*" (emphasis added)).

      The Court's focus on the information-gathering purpose behind the state action runs farther back as well. In *Kyllo v. United States*, 533 U.S. 27 (2001), for example, the Court found a search where police used a heat-detective device to gather information regarding the inside of a home, where the purpose of that device was to obtain information from inside the residence that could not otherwise have been obtained without a physical intrusion. *Id.* at 34 ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search…."). Indeed, the Court in its decision traced back to the plain meaning of the word "search," acknowledging its implicit information-gathering purpose: "When the Fourth Amendment was adopted, as now, to 'search' meant 'to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief." *Id.* at 32 n.1 (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989) (alterations omitted)); *see also Haerr v. United States*, 240 F.2d 533, 535 ("A search [under the Fourth Amendment] implies an examination of one's premises or person *with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest*." (emphasis added)).

The Court's decision in *New York v. Class*, 475 U.S. 106 (1986), also runs parallel to this principle. In *Class*, which this Court referenced during the suppression hearing, the Supreme Court found a "search" under the Fourth Amendment where police officers, following a traffic stop, opened the door of a car that was parked to look for the VIN number, reached into the interior of the car to move papers that were covering the area where the VIN was located, and in doing so, saw a gun under the driver's seat. *Id.* at 108. Although the Court did not explicitly discuss the information-gathering objective behind the officers' actions, clearly the act of opening a closed door and moving papers inside the car to look for information falls in line with the ordinary concept of searching to find information.

### B. Application to Facts

Applying these principles here, the question becomes—did Detective Lluis effect a "search" of the car when he reached into the car through a door left open by the Defendant, with his body half in and half out, merely to turn off the ignition? In the Government's view, and against the backdrop of the above case law, the answer is no. This is because, as Detective Lluis testified, he was not trying to search for anything at all when he turned off the car. He had no investigatory or information-gathering purpose. All he was doing was turning off the car, because the Defendant had left the engine running in a drive-through of a public bank on a Friday afternoon where cars and other customers were present; the tow truck could take upwards of two hours to arrive; and the car was stopped illegally. Thus, contrary to the officers in *Class*, *Jones*, *Jardines*, or *Kyllo*, Detective Lluis was not trying to find any information or to discover any evidence. He was merely turning off a car left running by the Defendant in a public drive-through pending arrival of the tow truck. He did not open the car door or move any papers or shuffle anything around in the car. He just put his body half-in-and-half-out through the door

left open the Defendant.  And it was the Defendant who got out of the car on his own prior ever to being ordered to do so, thus revealing the Defendant's interest in detaching himself from the vehicle and its contents.  Having partially entered the vehicle for that very limited, community and safety-related concern, Detective Lluis glanced backwards and saw the gun in plain view on the floor behind the passenger seat.

Given the complete absence of an information-gathering purpose in this case, and in light of the Supreme Court's strong and quite recent focus on whether the purpose behind the state action is to gather information or evidence, the Government submits that no "search" took place within the meaning of the Fourth Amendment.

## I. EVEN ASSUMING THAT DETECTIVE LLUIS "SEARCHED" THE CAR BY TURNING IT OFF ON THESE FACTS, HE CLEARLY DID NOT VIOLATE THE DEFENDANT'S FOURTH AMENDMENT RIGHTS.

### A. Relevant Legal Principles

Assuming Detective's act of turning off the car in this case amounts to a "search," there is nonetheless no Fourth Amendment violation.  As noted above, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  As the language makes clear, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are *unreasonable*."  *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) (emphasis added)).

An action is "reasonable" under the Fourth Amendment "as long as the circumstances, viewed objectively, justify [the] action."  *Scott v. United States*, 436 U.S. 128, 138 (1978).  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and brackets omitted)); *see also Class*, 475 U.S. at 116 ("There is no ready test

6

for determining reasonableness other than by balancing the need to search or seize against the invasion in determining the reasonableness of a search, 'one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place'' (quoting Terry v. Ohio, 392 U.S. at 1, 20)); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances."). Put another way, in analyzing the reasonableness of any search, one must consider first whether the action was justified at its inception, and second, whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Ordinarily, a search conducted without a valid warrant is presumptively unreasonable. But that presumption may be overcome in certain circumstances where the Court has determined the search to be reasonable. This is because, as the Supreme Court repeatedly has explained, "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *See, e.g.*, *Brigham City*, 547 U.S. at 403; *see also Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) ("The ultimate touchstone of the Fourth Amendment . . . is reasonableness." (internal quotation marks and brackets omitted)); *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014).

Out of that overriding reasonableness requirement, the Court has developed various exceptions to the warrant requirement to fit, as the Court has described, certain circumstances where a warrantless entry or intrusion has been deemed reasonable, such as exigent circumstances, consent, emergency-aid, and others. *See King*, 131 S. Ct. at 1856 (explaining that "the warrant requirement is subject to certain reasonable exceptions," such as the exigent

circumstance exception, because "the ultimate touchstone of the Fourth Amendment is reasonableness" (internal quotation marks omitted)); *Brigham City*, 547 U.S. at 403 (announcing that, "because the ultimate touchstone of the Fourth Amendment is reasonableness," the warrant requirement is subject to certain exceptions, and then describing various exigencies that make a warrantless search objectively reasonable, such as the need to assist persons who are injured); *Fernandez*, 134 S. Ct. at 1132 ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness.  And certain categories of permissible warrantless searches have long been recognized.  Consent searches occupy one of these categories." (internal citations, quotation marks, and brackets omitted); *Missouri v. McNeely*, 133 S. Ct. 1552, 1569-70 (2013) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness, and thus the warrant requirement is subject to certain reasonable exceptions," [including] . . . the exigent circumstances exception" (internal citation and quotation marks omitted)).

One of those exceptions has come to be known as the "community caretaker exception." Under the community caretaker doctrine, police may in certain circumstances conduct warrantless entries into vehicles—not to investigate criminal activity—but to serve the interests of public safety, for example, by moving a car that has crashed on a thoroughfare to permit the uninterrupted flow of traffic.  *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) ("Local police officers … frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."); *see generally S. Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (discussing the community caretaker doctrine).

8

The community caretaker doctrine has its origins in *Cady v. Dombrowski*, 413 U.S. 433 (1973), and its theoretical underpinnings in the frequency at which police have contact with cars as part of their everyday jobs enforcing traffic laws. *Id.* at 441 (describing the "extensive regulation of motor vehicles and traffic," "the frequency with which a vehicle can become disabled or involved in an accident on public highways," and the "extent of police-citizen contact involving automobiles"). In *Cady*, police officers searched the trunk of a rented car that had been disabled in an accident. The drunk driver of the car had informed the officers that he was a Chicago policeman. Believing that Chicago police officers were required to carry their service guns with them all the time, the officer searched for the gun on the defendant's person and in the glove compartment and front seat of the car, but they did not find one. The car then was towed to a private garage. Later that night, an officer visited the garage to search the car again for the Defendant's revolver as a matter of routine practice within the local police department. When the officer opened the locked trunk of the car, he discovered clothing and other items with blood on them, and that bloody evidence eventually was admitted in a murder trial against the Defendant.

In reviewing the constitutionality of the search, the Supreme Court upheld the search as a legitimate exercise of the police's community "caretaking" function. *Id.* at 446-48. After underscoring that the touchstone of the Fourth Amendment is "reasonableness," *id.* at 439, the Court explained that the officers were compelled to take custody of the car because the Defendant was drunk, and because they could not just leave the wrecked vehicle presenting a nuisance on the road. After they took custody of the car, they searched for the gun—not to gather evidence—but for safety reasons: the car had been towed to a garage lot, which was not secured, leaving any gun inside accessible to outsiders. *Id.* at 443. Thus, the Court held, the

warrantless search amounted to a lawful exercise of the police's community caretaking function. Id. at 447-48.

In *Opperman*, the Court further expounded upon the community caretaker:

In the interests of public safety and as part of what the Court has called 'community caretaking functions,' *Cady v. Dombrowski, supra*, 413 U.S. at 441, 93 S.Ct. at 2528, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

428 U.S. at 368-69 (footnote omitted).

It is important to remember that the community-caretaker exception—like all of the various exceptions to the warrant requirement (such as search incident-to-valid-arrest, exigent circumstances, community caretaker, emergency-aid, consent, and more)—is rooted in the "touchstone" of the Fourth Amendment, reasonableness, and thus the ultimate inquiry under the Fourth Amendment is and always has been the reasonableness of the search. *See, e.g.*, *Class*, 475 U.S. at 118 (undertaking a "reasonableness" balancing to determine the constitutionality of a search); *Cady*, 413 U.S. at 446-48 (same).

### B. Application to Facts

In this case, it cannot be said that Detective Lluis's mere act of reaching in the car to turn off the ignition under the circumstances was unreasonable. The reasonableness inquiry is context and fact specific, and here, the relevant facts are as follows.

The defendant drove recklessly through a residential and construction area and fled from police until eventually he pulled into a drive-through of a public bank, got out of his car on his

own, left his door open and his car running, and then was arrested in that drive-through area by two officers and placed in handcuffs on a nearby curb. The car was stopped illegally against traffic in that drive-through area on a Friday afternoon, during business hours, with other cars and customers. When the Defendant eventually came to a complete stop by the bank and couldn't go any farther, Detective Lluis already had determined that he was going to arrest the Defendant for reckless driving. Given the arrest, Detective Lluis made the decision to tow the car, as he was authorized to do. But, as Detective Lluis testified, the tow truck can take thirty minutes to more than an hour to arrive, and so Detective Lluis reached in through the open door, with his body half in and half out, merely to turn off the ignition so as not to keep the car running in a public drive-through with customers. He was not searching for anything at that time, although of course eventually the car was inventoried on scene.

Under these circumstances, Detective Lluis's entry into the car was plainly reasonable. First, it falls within the community-caretaker function announced in *Cady*. Under that exception, officers have authority as part of their routine contact with cars, and as part of the overarching need to protect the public, to tend to vehicles that, for example, present a hazard. *See generally United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005) (explaining how the community-caretaker doctrine exists "to seize and remove any vehicles[s] which may impede traffic, threaten public safety, or be subject to vandalism" (citing *Cady*)).

Here too, Detective Lluis had authority to do the minimal thing of turning off the car. Indeed, what were the alternatives? To leave the car running for however long the tow truck took to arrive, which in this case was nearly two hours, in the middle of a hot summer day in a public bank, where customers were coming in and out and could have accessed the car? To have the Defendant (who was detained and handcuffed), go turn off the car even though he had just

11

fled from police and had driven recklessly through the streets of Miami? To wait two hours for the tow truck to turn the keys off, which surely would have happened when the car got towed? Surely the Fourth Amendment's proscription against *unreasonable* searches does not require resort to insensible alternatives where, as here, police have a community caretaking function to deal with vehicles, protect the public, and minimize hazards in public areas.

Even beyond the community caretaking function specifically, the entry of the car was eminently reasonable. The Government is not aware of a judicial decision reflecting these specific, identical facts, that is, the turning-off-the-ignition-scenario as we have here. But the general principles of Fourth Amendment reasonableness apply in full force, and in this case, the search was "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (internal quotation marks omitted)). Indeed, the purpose of the interference was to turn off the car as a matter of public safety and common sense—that is, not to have a car just running in a public drive-through during business hours during an arrest situation. The scope of the interference was minimal. Indeed, all we have here is the mere act of reaching in to turn off the ignition. Nothing else. No investigatory purpose, no desire to find evidence, and no other movement of items inside the car or other interference.

Although not identical to these facts, the Sixth Circuit's decision in *United States v. Townsend*, 206 F. App'x 333 (2006) (unpublished), is instructive. In that case, a police officer came across a parked car at a gas pump with an individual slouched over and unresponsive at the wheel. *Id.* at 446. The officer, concerned about safety, and believing that the occupant was asleep or intoxicated, opened the car door, reached across the occupant, and removed the keys from the ignition. *Id.* In assessing the constitutionality of the key removal, the court conducted a general reasonableness analysis untied to a specific "exception" to the warrant requirement and

concluded that the officer's seizure of the keys was a "minimal intrusion" and a "reasonable and prudent safety precaution." *Id.* at 449. So, too, in *Class*, the Supreme Court analyzed the entering of a car to find a VIN number under the balancing of factors inherent in the reasonableness inquiry—concluding that the government's interest in obtaining VIN information is "of the first order," and the "particular method of obtaining the VIN … was justified by a concern for the officers' safety." 475 U.S. at 118. The Court also noted the minimal nature of the intrusion, explaining that the officer neither "root[ed] about the interior of respondent's automobile" nor "reach[ed] into any compartments or open any containers." *Id.*

Likewise here, Detective Lluis merely reached into the car, without even fully entering the car, just to turn the car off—without ever searching the interior of the car. Indeed, his actions are even less intrusive than the officer's conduct in *Townsend*, as the Defendant in this case had left the car door open when he stepped out of the car on his own, and thus Detective Lluis did not even open the door when he reached in. Under the totality of the circumstances, given the community-related safety interest in turning off the car in a public drive-through and the all-but-minimal intrusion effected by the act of turning off the ignition, there simply is no unreasonable search. The Defendant's Fourth Amendment rights were not violated.

Finally, it should be noted that, once Detective Lluis lawfully and reasonably was in the car, exercising his community-caretaking function (even assuming a search took place), he saw the firearm in plain view on the floor behind the passenger seat. At that point, the plain view exception clearly applies; Detective Lluis was lawfully in a place from which he could see an incriminating object in plain view. For basic safety concerns, he was not required to leave a possibly loaded firearm in a car in a public drive-through. Guns are inherently dangerous and, moreover, cannot be "opened carried" in the State of Florida, as was the case here (meaning, not

in a secure case but readily accessible).  *See* DE: 23 (Government's Response to the Defendant's Motion to Suppress).  Detective Lluis acted reasonably in taking out the chambered round (the gun was loaded) and seizing it.

## **CONCLUSION**

The Defendant's motion to suppress should be denied for the reasons outlined in this memorandum of law as well as in the Government's response to the Defendant's Motion to Suppress (DE:23).  At a minimum, the doctrine of inevitable discovery validates the search given the lawful inventory search conducted in this case.

                      Respectfully submitted,

                      WIFREDO A. FERRER
                    UNITED STATES ATTORNEY

By:  */s/ Aileen M. Cannon*
     Aileen M. Cannon
     Assistant United States Attorney
     Fla. Bar No. 0101484
     99 Northeast 4th Street
     Miami, Florida 33132-2111
     Aileen.cannon@usdoj.gov
     Tel: (305) 961-9002
     Fax: (305) 530-7976

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 17, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                       */s/ Aileen M. Cannon*
                                       Aileen M. Cannon